IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS, OREGON
WILD, and BENTON FOREST
COALITION,

       Plaintiffs,

   v.

BUREAU OF LAND MANAGEMENT,
an administrative agency of
the United States Department
of Interior,

       Defendant,

   v.

FRERES LUMBER COMPANY, INC.,
an Oregon corporation,

       Defendant-
       Intervenor.

Case No. 6:12-cv-00095-AA
OPINION AND ORDER

_____

Nicholas S. Cady
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

Peter M.K. Frost
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
    Attorneys for plaintiffs

Page 1 - OPINION AND ORDER

Ignacio S. Moreno
Assistant Attorney General
Brian M. Collins
U.S. Department of Justice
Environmental and Natural Resources Division
601 D. Street N.W.
Washington, District of Columbia 20004

S. Amanda Marshall
United States Attorney
Stephen J. Odell
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
     Attorneys for defendant

Scott W. Horngren
American Forest Resource Council
5100 S.W. Macadam, Suite 350
Portland, Oregon 97239
     Attorney for defendant-intervenor

AIKEN, Chief Judge:

Plaintiffs Cascadia Wildlands, Oregon Wild, and the Benton
Forest Coalition move for summary judgment pursuant to Fed. R. Civ.
P. 56.   Defendant the Bureau of Land Management ("BLM") and
defendant-intervenor Freres Lumbar Company, Inc. ("Freres")[1] each
filed cross-motions for summary judgment.   For the reasons set
forth below, the parties' motions are granted in part and denied in
part.

## BACKGROUND

This case involves a challenge to the BLM's authorization of
the Alsea River Watershed Restoration project ("Alsea Watershed
Program").   The Alsea Watershed Program is comprised of two basic

---

[1] Freres' arguments in favor of summary judgment are
analogous to those asserted by the BLM.   Accordingly, except
where otherwise indicated, the Court will address Freres' and the
BLM's motions together.

density management plans, which involve, in relevant part, mid-seral enhancement of approximately 768 acres of public land by means of commercial thinning, resulting in three timber sales: North Fork Overlook ("Overlook Project"), Buck Roberts, and Bummer Ridge.  Administrative Record ("AR") 662-64, 702-03.

At issue here is the Overlook Project, which consists of four forest stands, designated as 17A, 17B, 17C, and 19A, that encompass a total of 329 acres.  AR 693, 702, 716, 1253.  These stands are comprised primarily of younger trees that have been naturally regenerating since a severe fire in 1931; the project area also includes scattered 150 to 200 year-old trees, at the rate of less than one tree per acre, that survived the fire.  AR 702, 1253, 1342.  The Overlook Project entails variable density thinning, wherein selected younger trees would be removed in order to reduce resource competition and enhance conditions for the legacy trees. This procedure will also provide quality habitat for species living in the area, including the marbled murrelet and northern spotted owl, both of which are listed as threatened under the Endangered Species Act ("ESA").  AR 662-63, 977.  Ultimately, the project calls for the removal of between 149 and 161 younger trees per acre, resulting in an average of 35 to 45 trees remaining, which is consistent with the tree density of an undisturbed forest.  AR 16, 675, 1256-59.

In order to analyze the potential environmental impacts of the Alsea Watershed Program, the BLM conducted an environmental assessment, which was released for public comment on July 15, 2009;

Page 3 - OPINION AND ORDER

thereafter, the initial report was substantially revised by the BLM
and re-released for public comment on April 5, 2010 ("2010 EA").
AR 638-792, 963-1093.  On May 17, 2010, the BLM issued a "Revised
Upper and Lower Alsea River Watershed Restoration Environmental
Assessment and Finding of No Additional Significant Impact."   AR
474-82.  On June 29, 2011, the BLM issued the "Final Decision and
Decision   Rationale   for   the   North   Fork   Overlook   Mid-Seral
Enhancement," approving the Overlook Project and confirming that it
complied with the applicable land-use plans.  AR 142-58.

In  July  2011,  plaintiffs  challenged  the  Alsea  Watershed
Program via administrative protest.  AR 128-31, 136-37.  In October
2011,  the  BLM  responded  to  plaintiffs'  protests  and  affirmed  its
decision to proceed with the Overlook Project.  AR 113-17, 122-25.
After exhausting their administrative remedies, plaintiffs filed a
complaint  in  this  Court,  alleging  that  the  2010  EA  violates  the
Federal Land Policy and Management Act ("FLPMA") and the National
Environmental  Policy  Act  ("NEPA")  because  it  failed  to  analyze
whether  the  proposed  thinning  would  harm  the  red  tree  vole  in
stands 17A and 17B.[2]

#### STANDARD

A  federal  agency's  compliance  with  NEPA  or  the  FLMPA  is
reviewed under the Administrative Procedure Act ("APA").  5 U.S.C.

---

[2] The red tree vole is a species of rodent and is one of the
most arboreal mammals in the Pacific Northwest, living most of
its life in the forest canopy.  AR 9841.  The species is closely
associated with old-growth forest habitat; the red tree vole is
also an important source of food for the northern spotted owl and
other predators.  AR 9845, 10131-32.

§ 706.  In an APA case, summary judgment is awarded in favor of the plaintiff if, after reviewing the administrative record, the court determines that the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Natural Res. Def. Council v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)).  A decision is not arbitrary or capricious if the federal agency articulated a rational connection between the facts found and the choice made.  Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 384 F.3d 1163, 1170 (9th Cir. 2004);  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (courts examine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

Review under this standard is narrow and the court may not substitute its judgment for that of the agency.  Morongo Band of Mission Indians v. Fed. Aviation Admin., 161 F.3d 569, 573 (9th Cir. 1988).  Nevertheless, while this standard is deferential, the court must "engage in a substantial inquiry, . . . a thorough, probing, in-depth review."  Native Ecosys. Council v. U.S. Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

## DISCUSSION

Plaintiffs assert that the BLM's failure to analyze the Overlook Project's effects on the red tree vole, especially in light of significant new information, violates the FLPMA's substantive requirements and NEPA's procedural requirements.

I.    FLPMA Claim

Plaintiffs first argue that the BLM violated the FLPMA by failing to conduct a pre-disturbance survey of the red tree vole in stands 17A and 17B prior to authorizing the Overlook Project.  The BLM contends that it was exempt from these survey requirements because the stands at issue contain trees that are less than 80 years old.

A.    FLPMA Requirements

The FLMPA establishes requirements for land use planning on public lands.  See 43 U.S.C. §§ 1701-1785.  Under the FLPMA, the BLM is required to "develop, maintain, and when appropriate, revise land use plans to ensure that land management be conducted on the basis of multiple use and sustained yield."  Or. Natural Res. Council Fund v. Brong, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations and internal quotations omitted).  Once a land use plan is developed, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan."  43 C.F.R. § 1610.5-3(a).

The land use plan governing the Overlook Project is the Northwest Forest Plan ("NFP"), as incorporated into the Salem District Resource Management Plan.  AR 660.  The NFP establishes, in relevant part, a network of late-succession reserves, which must be managed to "protect and enhance conditions of [these] old-growth forest ecosystems," as well as the Survey and Manage Standards and Guidelines, which provide added environmental protections for rare and unique species such as the red tree vole.  AR 662-63, 1439,

Page 6 - OPINION AND ORDER

1559-60, 1741, 6865-7095; see also <u>League Of Wilderness Defenders</u>
<u>Blue Mountains Biodiversity Project v. Allen</u>, 615 F.3d 1122, 1130
(9th Cir. 2010). In January 2001, the Survey and Manage Standards
and Guidelines were modified; these changes are reflected in the
2001 Record of Decision ("2001 ROD").[3] AR 4556-715.

The current Survey and Manage Standards and Guidelines
("SMSG") compel federal agencies to conduct pre-disturbance surveys
before engaging in ground-disturbing activities such as tree
thinning. AR 4639-40. Where the pre-disturbance survey indicates
that red tree voles are present, the management recommendations
require the agency to establish a minimum ten-acre habitat around
active nest sites, wherein no logging can occur. AR 10129, 10140-
42. Subsequently, the 2001 ROD was amended by court order to
exempt four sub-categories of activities from its requirements;
notably, "[t]hinning projects in stands younger than 80 years old"
are not bound by the SMSG ("Pechman Exemption"[4]). AR 660, 2573;
see also <u>N.W. Ecosys. Alliance v. Rey</u>, 2006 WL 44361, *9 (W.D.Wash.
Jan. 9, 2006).

_____

[3] As the parties note, the NFP, as well as the 2001 ROD,
have been heavily litigated by both environmental groups and the
timber industry, and one of these appeals is still pending;
regardless, it is undisputed that the 2001 ROD, as well as the
four exceptions thereto, remain in effect. <u>See</u> Pls.' Mem. in
Supp. of Mot. Summ. J. 1-4; <u>see also</u> BLM's Mem. in Supp. of
Cross-Mot. Summ. J. 3-5.

[4] The exceptions at issue are commonly referred to as such
after Judge Pechman, who presided over the dispute out of which
they originated.

## B.   Analysis

The BLM determined that thinning was necessary to enhance mid-seral habitat, which in turn would accelerate development of legacy trees within the late-succession reserve; however, the BLM resolved that it was exempt from the 2001 ROD's pre-determination survey and buffer requirements because stands 17A and 17B of the Overlook Project are younger than 80 years. AR 123, 660-63, 9916.

Plaintiffs argue that this determination was arbitrary and capricious because: (1) "mixed-age stands that include only scattered individuals or patches of old trees . . . function ecologically much like classical 'old growth' stands that have large numbers of old trees"; (2) the method that the BLM used to calculate the age of these stands impermissibly drew "boundaries for a management unit in such a way so as to encompass enough young trees to draw down the mean average age of all trees"; and (3) the Pechman Exemption was intended to apply only where every individual tree in a stand is under 80 years old. Pls.' Mem. in Supp. of Mot. Summ. J. 10-11.

It is undisputed that units 17A and 17B each comprise a forest stand[5], which is "generally defined as an area of forest in which the trees are similar in size, species, and stocking." AR 45; see

---

[5] Plaintiffs state in their opening brief that "there should be no dispute that management units 17A and 17B each comprise a 'forest stands.'" Pls.' Mem. in Supp. of Mot. Summ. J. 10.  In their reply brief, however, plaintiffs argue for the first time that these units do not meet the definition of a stand because they "are not uniform in composition, age, or condition." Pls.' Reply to Mot. Summ. J. 1.  Because the Court finds that units 17A and 17B do constitute forest stands, the inconsistencies in plaintiffs' briefs are immaterial.

also AR 7648 (a stand is "[a]n aggregation of trees occupying a specific area and sufficiently uniform in composition, age, arrangement, and condition so that is distinguishable from the forest in adjoining areas"), 10130 (a "stand is usually a management unit"). It is also undisputed that nothing in the administrative record prescribes a particular method for calculating the age of a stand. In addition, it is undisputed that, beyond the language of the exception itself, there is no case law or other evidence in the record that addresses the intent behind the Pechman Exemption.[6]

Moreover, there is no "functional equivalence" criteria that impedes the BLM's application of the Pechman Exemption; essentially, plaintiffs argue that the SMSG apply regardless of the age of the stand where that stand functions like an old-growth habitat. Yet plaintiffs have not cited to, and the Court is not aware of, any authority that so holds; further, plaintiffs'

---

[6] Plaintiffs attach the declaration of Doug Heiken in support of their motion, in which Mr. Heiken states that the Pechman Exemption "was intended to apply to 'even-aged' stands where all trees in the stand are under 80-years old." Heiken Decl. ¶ 14. The BLM moves to strike this declaration, as well as Mr. Heiken's second declaration and Exhibit C to plaintiffs' reply brief, as extra-record evidence. Plaintiffs do not address the BLM's argument and, as such, have not shown that either Mr. Heiken's statements or Exhibit C satisfy any exception to record review rule under the APA. See Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005). The Court, however, is capable of independently resolving conflicts in the record and questions of admissibility, and therefore declines to strike the evidence at issue. See Or. Natural Desert Ass'n v. Sabo, 854 F.Supp.2d 889, 925 (D.Or. 2012) (denying as moot defendants' motion to strike where the "court has not considered the extra-record evidence offered by plaintiffs"). In any event, this Court is not bound by Mr. Heiken's legal conclusions. See, e.g, Alsea Valley Alliance v. Evans, 143 F.Supp.2d 1214, 1216-17 (D.Or. 2001).

interpretation is not supported by the text of the exception at issue and would significantly limit its scope. As such, the sole issue regarding plaintiffs' FLPMA claim is whether the BLM's determination that stands 17A and 17B were less than 80 years old was arbitrary and capricious.

### i.    Method Used for Calculating Age of Stands

In order to calculate the age of stands 17A and 17B, the BLM used the "basal area weighted average age" method, which requires the BLM to "physically sampl[e] approximately ten percent of the trees on each plot within a unit using an increment bore at breast height to determine the breast height age and then add seven years to determine the total age of tree"; "[f]or each diameter class of trees in the stand, BLM takes the age of the trees for that diameter class and multiplies it by the basal area of the trees of that diameter class." BLM's Mem. in Supp. of Cross-Mot. Summ. J. 12 (citing AR 105); see also AR 123. Using this method, the BLM determined that the stands at issue were each 68 years old. AR 123, 702-704, 887.

Plaintiffs do not specifically discuss the method employed by the BLM; instead, plaintiffs generally object to any method that involves averaging, particularly because the BLM had discretion to determine the boundaries of each stand. In support of their argument, plaintiffs rely on Brong, 492 F.3d 1120 (holding that the averaging method employed by the BLM to calculate the proposed project's effects was grossly misleading and inconsistent with the NFP). In other words, plaintiffs argue that the BLM acted in a

Page 10 - OPINION AND ORDER

wrongful manner by not delineating smaller sub-stands, comprised of individual or small groupings of 150 to 200 year-old legacy trees, within the larger units of 17A and 17B, to which the SMSG should apply.

Plaintiffs' argument is rejected for two reasons. First, unlike Brong, plaintiffs have not cited to any evidence indicating that the BLM manipulated the boundaries in order to exclude older trees or include younger trees, thereby lowering the average age of each stand. In fact, stands 17A and 17B are relatively contiguous and their boundaries track natural barriers, such as roads or creeks, rather than artificially determined barriers. AR 693, 1266; see also AR 308 (BLM field meeting notes explaining that the stands at issue were classified by using aerial photographs from the 1970s and recent ground observations). In addition, it is undisputed that the region at issue "include[s] relatively thick and homogenous stands" and that the proposed action would occur uniformly throughout the area. Pls.' Mem. in Supp. of Mot. Summ. J. 7; see also AR 1256-59.

Thus, Brong, in which there was evidence that the BLM "attempt[ed] to dilute the effects of its proposed activities by averaging the snag retention" over a broad geographical region to determine that "between eight and twelve large snags per acre will still be standing" after "over two-thirds of the affected acreage will [actually] be completely stripped of all salvageable trees," is inapposite. Brong, 492 F.3d at 1129-30 (citing Pac. Coast Feder'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.,

Page 11 - OPINION AND ORDER

265 F.3d 1028, 1035-36 (9th Cir. 2001)).  Further, as the BLM appropriately noted, "legacy trees at less than one per acre do not meet the criteria for a stand."  AR 45; see also AR 702, 1253, 1342.  Accordingly, the BLM reasonably included these older trees in calculating the respective ages of the management units at issue.

Second, the record reveals that the actual method employed by the BLM was neither arbitrary nor capricious.  This method not only takes into account every tree, but also gives greater weight to the older legacy trees, which in turn increases the overall age of these stands.  Once again, plaintiffs do not cite to any evidence in the record, or provide a calculation of their own, demonstrating that there was anything misleading about the BLM's calculations. In addition, this method is generally accepted amongst silviculturists, recommended by the Regional Ecosystem Office, and has been employed by the BLM for over 15 years.  AR 105, 123, 5882. Notably, the same stand-aging method was used in the two other phases of the Alsea Watershed Program, Buck Roberts and Bummer Ridge, both of which plaintiffs support.  See Pls.' Mem. in Supp. of Mot. Summ. J. 7.  Without more, plaintiffs are unable to establish that the BLM's methodology is not entitled to deference by this Court.  See, e.g., Allen, 615 F.3d at 1130.

In sum, plaintiffs failed to identify any evidence intimating that the BLM manipulated the boundaries of these stands or otherwise employed an improper method for determining their age. As such, the BLM's delineation of stand boundaries and its

calculation of stand age was neither arbitrary nor capricious.

ii. <u>Whether All Trees in a Stand Must be Under 80 Years</u>
<u>Old in Order for the Pechman Exemption to Apply</u>

The Pechman Exemption excuses "[t]hinning projects in stands younger than 80 yeas old" from conforming with the SMSG. AR 660, 2573. Plaintiffs argue that the exemption applies only to even-aged stands, wherein all trees in the stand are under 80 years-old, rather than to those composed of trees of disparate age, some of which exceed the 80-year age limit.

Where, as here, there is an issue regarding the proper interpretation of the NFP, the beginning point of judicial review is its plain language. <u>See</u> <u>Powell</u>, 395 F.3d at 1034. If, however, the court determines that the language is ambiguous, then the agency's interpretation is afforded deference. <u>Id.</u>; <u>see also</u> <u>Ecology Ctr. v. Castaneda</u>, 574 F.3d 652, 661 (9th Cir. 2009) ("[a]ssuming [that it] leaves some ambiguity . . . we defer to the [agency's] reasonable interpretation of the Forest Plan's requirements").

As discussed above, beyond the plain language, there is no evidence regarding the intent behind the Pechman Exemption or whether it applies only to only even-aged stands. Nonetheless, in their reply brief, plaintiffs cite to the NFP in support of their contention that the Pechman Exemption was only intended to apply to even-age stands. The portion of this publication on which plaintiffs' rely merely notes that thinning "in existing even-age" stands "may be considered" a beneficial treatment. AR 7004. Thus,

Page 13 - OPINION AND ORDER

this statement does not establish that the Pechman Exemption was intended to apply only to even-aged stands.   Moreover, this document predated the Pechman Exemption and therefore is not illustrative of the intent behind that exception.   In other words, the "general language of the [NFP] does not operate to modify the language of the later-issue Pechman Injunction."   BLM's Reply to Cross-Mot. Summ. J. 5.

The parties who drafted the Pechman Exemption[7] could have simply stated that any individual grouping of trees more than 80 years of age should, in all instances, comply with the 2001 ROD; however, the plain language of the exception does not include such a restriction.   Instead, the Pechman Exemption applies generally to "stands younger than 80 years old."   AR 2573.   Thus, the plain language contemplates the age of the entire stand, rather than its individual groupings of trees.   To the extent that this language is ambiguous, the BLM's interpretation, which is consistent with the above analysis, is given deference.

As a result, this Court can find no justifiable basis for delineating between individual groups of trees in a particular stand proposed for thinning, which would be surveyed for red tree voles, and the remainder of the stand, which would be exempted. This is especially appropriate because it is undisputed that, with

---

[7]As the BLM notes, "at least one of the [p]laintiffs in this action was involved in drafting the language of the proposed injunction . . . [had they] truly intended the result they now seek, they could have petitioned Judge Pechman for that language in the injunction [yet plaintiffs] did not."   BLM's Reply to Cross-Mot. Summ. J. 3 n.2.

the exception of approximately one legacy tree per acre, which are not themselves being thinned and which do not individually qualify as stands, 17A and 17B are comprised of trees that are similar in size, species, and stocking. Therefore, based on the record before the Court, the BLM reasonably determined that the Overlook Project was exempt from the 2001 ROD. Accordingly, the BLM's and Freres' motions are granted as plaintiffs' FLPMA claim; plaintiffs' motion is denied.

II.   NEPA Claims

Plaintiffs next contend that the BLM violated NEPA by failing to: (1) take a "hard look at the project's effects on the red tree vole"; and (2) analyze significant new information. Pls.' Mem. in Supp. of Mot. Summ. J. 13.

A.   NEPA Requirements

NEPA is "a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." Sierra Club v. Bosworth ("Sierra Club I"), 510 F.3d 1016, 1018 (9th Cir. 2007) (citation and internal quotations omitted). To accomplish the "hard look" requirement, NEPA requires all agencies to prepare an environmental impact statement ("EIS") for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The agency first prepares an environmental assessment ("EA") to determine whether an action will be significant; if the agency concludes there is no significant effect associated with the

Page 15 - OPINION AND ORDER

proposed action, it may issue a Finding Of No Significant Impact, "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant," in lieu of preparing an EIS. Sierra Club I, 510 F.3d at 1018 (citation and internal quotations omitted); 40 C.F.R. § 1508.9. Thus, an EA "need not be extensive." Grand Canyon Trust v. U.S. Bureau of Reclamation, 623 F.Supp.2d 1015, 1026 (D.Ariz. 2009).

B.    Analysis

The BLM evaluated the environmental impacts of the Alsea Watershed Program between 2009 and 2010, resulting in the 2010 EA. AR 638-792.    The 2010 EA acknowledges that the Alsea Watershed Program calls for thinning in forest stands that have some active red tree vole sites.    AR 717, 721.    The BLM determined, however, that the program was "not anticipated to have an appreciable affect on the population of red tree voles in this watershed since voles are well-distributed throughout the watershed and since the action will not remove any older forest structure which provides the best habitat for supporting population persistence."    AR 721, 801.    In addition, the BLM found that the Alsea Watershed Program would improve old-growth habitat "such that the persistence of the voles in the watershed in the long term will not be impacted."    BLM's Reply to Cross-Mot. Summ. J. 7 n.6 (citing AR 717, 721, 766); see also AR 662.

i.    Failure to Take a Hard Look

In assessing whether the agency took the requisite "hard look," the court reviewing an agency's EA considers whether it

Page 16 - OPINION AND ORDER

contains "a reasonably thorough discussion" of the significant aspects of the probable environmental consequences of the proposed action. See Nat'l Parks & Conservation Ass'n v. BLM, 606 F.3d 1058, 1072 (9th Cir. 2010), cert. denied, 131 S.Ct. 1783 (2011) (citation and internal quotations omitted).   Plaintiffs contend that the 2010 EA is erroneous because it evaluated the effects of the prosed action across the entire watershed, instead of providing analysis of the "health of voles in the project area."   Pls.' Mem. in Supp. of Mot. Summ. J. 15.   In addition, plaintiffs assert that the BLM wrongfully determined that the project will not have an "appreciable effect on voles" because "the management recommendations establish that the agency must, at a minimum, set aside a 10-acre buffer around active nests."[8]  Id.

As an initial matter, the management recommendations are only relevant when a pre-disturbance survey, performed pursuant to the SMSG, implicates that red tree voles are present in the proposed project area.   AR 4639-40, AR 10129, 10140-42.   As discussed above, the BLM properly determined that the stands at issue where less than 80 years old, such that the Overlook Project fell within the Pechman Exemption.   As such, the SMSG, and by extension the

---

[8] Plaintiffs also argue that the 2010 EA is not well-reasoned because "the record makes clear 'that repeated clear-cutting or thinning at short intervals will isolate and eventually eliminate tree vole populations.'"  Pls.' Mem. in Supp. of Mot. Summ. J. 15 (citing AR 1745).   The 2010 EA, however, does not contemplate or authorize any clear-cutting or repeated thinning at short intervals.   Accordingly, plaintiffs' contention is without support in the record and will not be addressed further.

management recommendations, do not apply to the proposed action.[9] Thus, whether the management recommendations contradict the 2010 EA is immaterial.

Moreover, NEPA regulations only "direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1010-11 (9th Cir. 2006) (citation omitted). That is precisely what occurred in this case. The record before the BLM at the time of the 2010 EA indicated that red tree voles were relatively common and well-distributed in federally managed lands "except in the North Coast ranges of Oregon and the foothills of the Willamette Valley where there is little federally managed land." AR 1742-45; see also AR 1748, 1750. Accordingly, at the time of the BLM's decision, there was a "0 percent likelihood that the [red tree vole] would be extirpated from federally management lands . . . and 73 percent likelihood that the population of this species would be stable, well distributed across federally managed lands in the [NFP] area." AR 1745.

The BLM expressly relied on this information in determining that the red tree vole "[p]opulations south of Highway 20 including those within the Upper and Lower Alsea River watersheds are believed to be more abundant and well distributed." AR 717.

---

[9] The Court notes further that the management recommendations only mandate a pre-disturbance survey where a non-exempt stand contains "two or more" legacy trees per acre. AR 10114. Plaintiffs have not identified any evidence in the record indicating that stands 17A and 17B meet this requirement; to the contrary, the record reveals that these stands contain less than one legacy tree per acre. See AR 702, 1253, 1342.

Nonetheless, the BLM took precautions to minimize the effects of the Overlook Project on the red tree vole. For example, the project was designed to avoid removal of legacy trees, which are critical habitat for the species; in addition, only a select portion of the project area was proposed for thinning, such that there will remain many areas surrounding the stands at issue that will not be subject to any activity, wherein voles will likely be undisturbed. AR 693, 721. In fact, the restoration project was expected to accelerate the formation of old-growth forests in the long-term, which will ultimately benefit the red tree vole. AR 484-99, 662-64. Accordingly, while the BLM acknowledged that the project would have some adverse effects on individual voles within stands 17A and 17B in the short-term, the proposed action would, overall, not have a discernable impact on the species.

Plaintiffs have not identified any evidence that contradicts the BLM's determination; instead, plaintiffs argue that the use of a watershed-level scale to evaluate the site-specific impacts to a species violates NEPA and cite to Pac. Coast in support of their assertion. This Court is not persuaded that the reasoning in Pac. Coast, an ESA case, applies here. As this District recently explained, the ESA "imposes more stringent requirements" than those at issue in this case. See League of Wilderness Defenders v. U.S. Forest Serv., 2012 WL 3255083, *16 (D.Or. Aug. 10, 2012).

Further, unlike Pac. Coast, there is no concern here that the BLM enlarged the scale of its analysis purposefully to minimize the proposed action's effect on the red tree vole. See Pac. Coast, 265

Page 19 - OPINION AND ORDER

F.3d at 1036-37. As discussed above, no such misleading tactics are apparent in the record before the Court; rather, the BLM delineated stands that are relatively contiguous and their boundaries are consistent with natural barriers. AR 693, 702; see also Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002) ("[o]rdinarily, an agency has the discretion to determine the physical scope used for measuring environmental impacts"). In addition, the 2010 EA did include analysis regarding the cumulative effects of the project on the red tree vole in the Overlook Project area, but merely determined that the impact would not be significant to the population in the watershed because none of the older forest structures were being removed. AR 721.

The foregoing discussion reveals that the BLM provided a reasonably thorough analysis, which was adequately supported by materials in the administrative record, of the critical aspects of the likely environmental consequences in concluding that the Alsea Watershed Program's effect on the red tree vole were not significant. This court must defer to the agency's determinations where, as here, "those conclusions are supported by studies that the agency deems reliable." Native Ecosys. Council v. Weldon, 2012 WL 4215919, *5 (9th Cir. Sept. 21, 2012) (citation and internal quotations omitted). Thus, while this Court may have reached a different conclusion based on the same evidence, because it may not substitute its judgment for that of the BLM, the agency's decision must be upheld. See, e.g., Envtl. Prot. Info. Ctr. v. Forest Serv., 451 F.3d 1005, 1010-11 (9th Cir. 2006) ("[i]t was not

Page 20 - OPINION AND ORDER

arbitrary and capricious for [the agency] to determine that although there will be some effect on individuals pairs, this will not cause a significant adverse effect on the species and requires an EIS").

Therefore, plaintiffs' motion for summary judgment is denied to the extent that it is based on the BLM's failure to take a hard look at the project's impact on the red tree vole under NEPA; the BLM's and Freres' motions are granted in this regard.

ii. Failure to Analyze New Significant Information

NEPA imposes a continuing duty on federal agencies to supplement their analyses to respond to new information. 40 C.F.R. § 1509(c)(1)(ii). Nonetheless, an agency is not required to prepare a supplemental EIS or EA every time new information comes to light; rather, a supplemental analysis is required only if changes, new information, or circumstances may result in significant environmental impacts in a manner not previously evaluated and considered. See N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1157 (9th Cir. 2008).

After the BLM issued the 2010 EA and its final directive, the United States Fish and Wildlife Service ("FWS") issued a "12-Month finding on a Petition to List a Distinct Population Segment of the Red Tree Vole as Endangered or Threatened." AR 9841-883; see also 76 Fed.Reg. 63720 (Oct. 13, 2011). The study's conclusions primarily relate to a Distinct Population Segment ("DPS") of red tree vole that inhabits area in the Northern Coast Range, the majority of which is concentrated in the areas north of Highway 20.

Page 21 - OPINION AND ORDER

AR 9851 (map of the North Oregon Coast DPS).    Within the DPS,
however, the FWS identified two clusters of Federal land, one
"south of U.S. Highway 20" and the other "lying north of Highway
20, mainly between Lincoln City and Tillamook," which constituted
"most of the remaining high-quality habitat for red tree voles."
AR 9870.    The FWS found that listing the north Oregon Coast
population of the species under the ESA was warranted but precluded
by higher priority actions to amend the Lists of Endangered and
Threatened Wildlife and Plants.    AR 9876-78.    As a result, the FWS
added the red tree vole to its Candidate Species List.    Id.

The study also revealed that: (1) "[h]abitat loss appears to
at least partly explain the apparent reduction in tree vole
numbers, both rangewide and within the DPS"; (2) "continuing timber
harvest in younger forest areas adjacent to remaining patches of
older forest diminished the habitat quality of these stands by
maintaining them in an isolated and fragmented condition that may
not allow for persistent populations of red tree vole"; (3)
"thinning stands occupied by red tree voles can reduce vole numbers
or eliminate them . . . especially if thinning design does not
account for structural features and the connectivity of those
features"; (4) projects aimed at increasing legacy tree growth in
the long-term are "likely not sufficient to offset the loss,
modification, and fragmentation of habitat and isolation of
populations that collectively pose an immediate threat to the red
tree vole in the DPS"; and (5) "loss of either cluster on Federal
lands would result in the single remaining cluster and its

Page 22 - OPINION AND ORDER

associated tree vole population being highly vulnerable to extirpation or even extinction . . . Under present conditions, the Federal lands north of Highway 20 are already considered insufficient to support stable populations of red tree vole." AR 9855-71.

Plaintiffs contend that, because "[c]ourts have ruled that FWS' finding that a species is warranted biologically for listing under the ESA, but precluded for other reasons, is significant new information that triggers the duty to supplement," the BLM's failure to do so here violates NEPA. Pls.' Mem. in Supp. of Mot, Summ. J. 17.

Conversely, the BLM argues that this new information was not significant because the stands at issue "are located south of Highway 20" and "the 12-Month Finding presented much of the same information that was already considered as part of the Alsea River EA." BLM's Mem. in Supp. of Cross-Mot. Summ. J. 22. Moreover, the BLM asserts that the FWS' determination that the red tree vole was a threatened species does not automatically trigger its duty to supplement; the BLM cites to Swanson v. U.S. Forest Serv., 87 F.3d 339 (9th Cir. 1996), and Forest Conservation Council v. Espy, 835 F.Supp. 1202 (D.Idaho 1993), aff'd, 42 F.3d 1399 (9th Cir. 1994), in support of its contention.

As a preliminary matter, contrary to the BLM's assertion, the DPS expressly encompasses areas south of Highway 20, including the proposed project site. See AR 9851, 9870. Moreover, the precedent on which the BLM relies is distinguishable from the present case.

In Swanson, the court found that the listing of chinook salmon as a threatened species under the ESA did not require supplementation under NEPA; in its original EIS, the federal agency "examined the effect that the actions would have on the chinook salmon" and concluded that it was "unlikely that the proposed actions would have a negative impact." Swanson, 87 F.3d at 344. The agency also proactively procured the opinion of the National Marine Fisheries Service that the project would not adversely affect the chinook. Id. The court concluded that, because the agency "previously determined that it was unlikely that the proposed actions would have a negative impact on the salmon," and "this finding was not premised on the salmon's non-threatened status, the determination that the salmon were in fact threatened did not constitute new information." Id.

In Espy, the project at issue was the paving of a dirt road that ran parallel to the Salmon River; the construction activities were, in the short-term, expected to have adverse effects on the salmon habitat. Espy, 835 F.Supp. at 1215. The court concluded that, although the salmon had recently been listed as threatened, the agency was not required to prepare a supplemental EIS because the listing "did not provide new information or change the condition of the salmon or the habitat [of the] Salmon River." Id. at 1216.

Here, the BLM concedes that "there is expected to be a short term impact on individual voles within the project area." BLM's Mem. in Supp. of Cross-Mot. Summ. J. 21. Thus, unlike Swanson, the

Page 24 - OPINION AND ORDER

record in this case indicates that the proposed actions would negatively effect the red tree vole. In addition, while the 12-month report does overlap somewhat with the information that the BLM evaluated pursuant to the 2010 EA, it also contains a substantial amount of new information; therefore, the facts of this case are distinct from Espy. As such, Swanson and Espy are not binding and new information concerning the health of the red tree vole, regardless of its biological status, is relevant.

Notably, the FWS study revealed that projects aimed at increasing old-growth habitats are unlikely to ameliorate the threat of extirpation to the vole population within the DPS; the study also indicated that thinning younger trees in stands occupied by red tree voles, especially where, as here, there are no accommodations made to protect tree connectivity, was likely to reduce or eliminate the species. AR 9855-71. In addition, the FWS' finding that the vole is warranted for listing under the ESA undermines the BLM's argument that vole populations in the project area are healthy and well-distributed.

More importantly, the survey reveals that the assumptions on which the 2010 EA were premised - namely, that thinning around legacy trees in stands containing red tree voles will not impact the species and that the long-term habitat gains resulting from the proposed action would offset any short-term losses to the vole population - were incorrect. See Native Ecosys. Council, 418 F.3d at 964 (an "agency may not rely on incorrect assumptions or data" in its NEPA analysis). This new information, when considered in

Page 25 - OPINION AND ORDER

conjunction with the fact that the loss of either cluster of Federal lands within the DPS would render the red tree vole highly vulnerable to extirpation or extinction, is significant.[10] See, e.g., Sabo, 854 F.Supp.2d at 923-24 (designation of new sensitive species in the area and the documentation of damage from the proposed agency action on the species and their habitats was new information adequately significant to warrant a supplemental EA).

Essentially, the FWS' survey suggests that the cumulative effects of the proposed project on the red tree vole could result in irreparable injury to that species, especially because the area south of Highway 20, in which the Alsea Watershed Program lies, is the last remaining stronghold for the vole. AR 9870-71. In similar circumstances, courts have held that the federal agency acted in an arbitrary and capricious manner, and determined that supplemental NEPA review was required. See, e.g., Sabo, 854 F.Supp.2d at 923-24; Sierra Club v. Bosworth ("Sierra Club II"), 465 F.Supp.2d 931, 940-41 (N.D.Cal. 2006); see also Native Ecosys. Council v. Tidwell, 599 F.3d 926, 937-38 (9th Cir. 2010) (supplemental analysis required where new information was inconsistent with the EA).

Therefore, the Court finds that the BLM failed to take the

---

[10] Contrary to Freres' assertion at oral argument, a finding of significance concerning new information does not necessarily entail the preparation of an EIS. See, e.g., Sabo, 854 F.Supp.2d at 923-24; Tidwell, 599 F.3d at 938. In other words, to the extent that this Court finds the FWS survey to be significant, that finding is only in regard to the type of information contained therein and not as to the proposed project's impact on the environment.

requisite hard look under NEPA at this significant new information. Plaintiffs' motion for summary judgment is granted as to this issue; the BLM's and Freres' motions are denied. Accordingly, this case is remanded to the agency and the Overlook Project is enjoined until the BLM performs a proper supplemental NEPA review in light of the new information contained in the FWS' most recent survey of the red tree vole.

## CONCLUSION

The BLM's and Freres' motions for summary judgment (docs. 23, 25) are GRANTED as to plaintiffs' FLPMA claim and NEPA claim regarding the BLM's failure to analyze the Overlook Project's effects on the red tree vole, and DENIED as to plaintiffs' remaining NEPA claim. Plaintiffs' motion for summary judgment (doc. 22) is GRANTED as to their NEPA claim regarding the BLM's failure to analyze significant new information regarding the red tree vole and DENIED in all other respects.

Therefore, the BLM is enjoined from going forward with the Overlook Project until a supplemental EA has been conducted. By separate order, the Court will set a status conference to discuss further management of this case. Finally, the BLM's motion to strike (doc. 25) is DENIED.

IT IS SO ORDERED.

Dated this $\cancel{21}$ of December 2012.

Ann Aiken
United States District Judge